## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION
## AT GREENEVILLE

| | | |
|---|---|---|
| TABBATHA BENSON, SCOTT FRIEDSON, MICHAEL BROOKS, JOE SOLO, and BRITTANY CHUNG, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>LG PHILIPS LCD CO., LTD; LG PHILIPS LCD AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SHARP CORPORATION; SHARP ELECTRONICS CORPORATION; TOSHIBA CORPORATION; TOSHIBA MATSUSHITA DISPLAY TECHNOLOGY CO., LTD.; HITACHI LTD., HITACHI DISPLAYS, LTD.; HITACHI AMERICA LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SANYO EPSON IMAGING DEVICES CORPORATION; NEC CORPORATION; NEC LCD TECHNOLOGIES, LTD.; NEC ELECTRONICS AMERICA, INC.; IDT INTERNATIONAL, LTD.; AU OPTRONICS; INTERNATIONAL DISPLAY TECHNOLOGY CO., LTD.; INTERNATIONAL DISPLAY TECHNOLOGY USA, INC.; AU OPTRONICS CORPORATION AMERICA; CHI MEI OPTOELECTRONICS; CHE MEI OPTOELECTRONICS USA, INC.; CHUNGWA PICTURE TUBES, LTD.; and HANNSTAR DISPLAY CORPORATION,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Tabbatha Benson, Scott Friedson, Michael Brooks, Joe Solo, and Brittany Chung, by their attorneys, bring this civil action for damages and injunctive relief on behalf of themselves and all other similarly situated in Tennessee, Arizona, California, and Nebraska (the "Class Jurisdictions") against the above-named Defendants[1] and demanding a trial by jury complain and allege as follows:

## JURISDICTION AND VENUE

1.  This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amends 28 U.S.C. §1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiff is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs. *See* 28 U.S.C. §1332(d)(2) and (6). This Court also has jurisdiction under 28 U.S.C. §1332(d) because "one or more members of the class is a citizen of a state within the U.S. and one or more of the Defendants is a citizen or subject of a foreign state." The Court also has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court and Defendants systematically and continually conduct business here and throughout the U.S., including marketing, advertising, and sales directed residents of Tennessee, Arizona, California, and Nebraska.

2.  This Court has venue under 15 U.S.C. §22 and 28 U.S.C. §1391 because Defendants reside, transact business, or are found within this District, and a substantial part o the events giving rise to the claims arose in this District.

---

[1]  "Defendants" mean each of the above-captioned Defendants who, individually, and collectively through their combination and conspiracy, perpetrated the wrongful conduct complained of herein.

2

## DEFINITIONS

3.     As used herein, the term "TFT-LCD Products" means Thin Film Transistor Liquid Crystal Display products, including such products as are used in televisions, computer (both desktop and notebook) monitors, mobile phones, personal digital assistants ("PDA's") and other devices.

4.     As used herein, the term "Class Period" means the time period extending from at least January 1, 1998 through at least December 31, 2005.

## THE PARTIES

### The Plaintiffs

5.     Plaintiff Tabbatha Benson, a resident of Tennessee, indirectly purchased TFT-LCD Products from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

6.     Plaintiff Scott Friedson, a resident of Arizona, indirectly purchased TFT-LCD Products from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

7.     Plaintiff Michael Brooks, a resident of California, indirectly purchased TFT-LCD Products from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

8.     Plaintiff Joe Solo, a resident of California, indirectly purchased TFT-LCD Products from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

3

9.     Plaintiff Brittany Chung, a resident of Nebraska, indirectly purchased TFT-LCD Products from one or more of the Defendants during the Class period, for end use and not for resale, and was injured as a result of Defendants' illegal conduct.

**The Defendants**

10.     Defendant LG Philips LCD Co., Ltd. ("LG Philips") is a Korean entity with its principal place of business located at 20 Yoido-dong, Youngdungpo-gu, Seoul 150-721, Republic of Korea. LG Philips is a joint venture created in 1999 by Philips Electronics NV and LG LCD. LG Philips maintains offices in San Jose, California. In its Form 6-K filed on December 11, 2006 with the United States Securities and Exchange Commission ("SEC"), LG Philips stated that it "is a leading manufacturer and supplier of thin-film transistor liquid crystal display (TFT-LCD) panels"; that it "manufacturers TFT-LCD panels in a wide range of sizes and specifications for use in TVs, monitors, notebook PCs, and various applications"; that it "currently operates seven fabrication facilities and four back-end assembly facilities in Korea, China and Poland." (<http:www.lgphilips-lcd.com/homeContain/jsp/eng/inv/inv200_j_e.jsp>). During the Class Period, LG Philips manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

11.     Defendant LG Philips LCD America, Inc. is an entity organized under the laws of California with its principal place of business located at 150 East Brokaw Road, San Jose, CA 95112. During the Class Period, LG Philips LCD America, Inc. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

12.     Defendant Samsung Electronics Co. Ltd. ("Samsung") is a business entity organized under the laws of South Korea, with its principal place of business at Samsung Main

4

Building 250-2 ga. Taepyung-ro Chung-gu, Seoul, Korea. During the During the Class Period, Samsung manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

13. Defendant Sharp Corporation is a business entity organized under the laws of Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. During the Class Period, Sharp Corporation manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

14. Defendant Sharp Electronics Corporation is a wholly owned and controlled subsidiary of Sharp Corporation, with its principal place of business at Sharp Plaza, Mahwah, New Jersey, 07430. During the Class Period, Sharp Electronics Corporation manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska. Sharp Corporation and Sharp Electronics Corporation are referred to collectively herein as "Sharp".

15. Defendant Toshiba Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. During the Class Period, Toshiba Corporation manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

16. Defendant Toshiba Matsushita Display Technology Co., Ltd. is a business entity organized under the laws of Japan, with its principal place of business located at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo 108-0075, Japan. Defendant Toshiba Corporation states on its website the following regarding Toshiba Matsushita Technology Co.,

Ltd.: "[a]dvanced capabilities in LCD and organic LED displays drive product development and production and enhanced sales operations with a truly worldwide reach. The company is the undisputed leader in low temperature polysilicon TFT technology, the preferred display for mobile devices and the underpinning technology for organic LED, the next generation display-or-choice for a range of products, including thin profile televisions. These leading-edge capabilities support us in providing high value added displays that are light and thin, consume little power and offer excellent image quality." (<http://www.toshiba.co.jp/worldwide/about/company /tmd.htm>). During the Class Period, Toshiba Matsushita Display Technology Co., Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska. Toshiba Corporation and Toshiba Matsushita Display Technology Co., Ltd. are referred to collectively herein as "Toshiba".

17. Defendant Hitachi Ltd. is a business entity organized under the laws of Japan, with its principal place of business at 6-1 Marunouchi Center Building 13F Chiyoda-ku, Tokyo, 100-8220, Japan. During the Class Period, Hitachi Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

18. Defendant Hitachi Displays, Ltd. is a business entity organized under the laws of Japan, with its principal place of business located at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. On its website, Hitachi Displays, Ltd. states that "[w]e provide the world's best products, quality and service to meet the needs of the digital age. These include Hitachi's proprietary Advanced-Super IPS LCDs offering clear pictures from any angle; large-sized LCD modules for TVs using our original moving picture technology; small-sized

LCD modules for information terminal devices such as cellular phones and digital cameras with low power consumption and high resolution picture realized by LTPS (low-temperature poly-silicon) technology; and the middle-sized colorful LCD modules for amusement devices. We also produce components such as LCD drivers, color filters and back-lights." (<http://www.hitachi-displays.com/en/company/work/index.html>). During the Class Period, Hitachi Displays, Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

19.     Defendant Hitachi America Ltd. is a wholly owned and controlled subsidiary of defendant Hitachi Ltd. Hitachi America Ltd. is a business entity organized under the laws of New York, with its principal place of business at 50 Prospect Avenue, Tarrytown, New York, 10591. During the Class Period, Hitachi America Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

20. Defendant Hitachi Electronic Devices (USA), Inc. is a wholly owned and controlled subsidiary of Defendant Hitachi Ltd., and is a business entity with its principal place of business located at 575 Mauldin Road, Greenville, SC, 29607. During the Class Period, Hitachi Electronic Devices (USA), Inc. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska. Defendants Hitachi Ltd., Hitachi Displays, Ltd., Hitachi America Ltd. and Hitachi Electronic Devices (USA), Inc. are referred collectively herein as "Hitachi."

21.     Defendant Sanyo Epson Imaging Devices Corporation ("Sanyo Epson") is a "joint venture of Seiko Epson Corporation and Sanyo Electric Co., Ltd., started operations on October 1, 2004. It combines the liquid crystal display operations of Epson, Sanyo Electric, and Sanyo

Group companies Tottori Sanyo Electric Co., Ltd. and Sanyo LCD Engineering Co., Ltd. and mobilizes each company's special fields of miniaturization, high resolution, high definition, and volume production technology." (<http://www.sanyo-epson.com/e/company/outline/index.html>). Defendant Sanyo Epson's principal place of business is located at World Trade Center Building 15F, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo, Japan. During the Class Period, Sanyo Epson manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

22. Defendant NEC Corporation is a business entity organized under the laws of Japan, with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo 108-8001, Japan. During the Class Period, NEC Corporation manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

23. Defendant NEC LCD Technologies, Ltd. is wholly owned and controlled subsidiary of Defendant NEC Corporation, and is an entity organized under the laws of Japan, with its principal place of business located at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa 211-8666, Japan. During the Class Period, NEC LCD Technologies, Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States including Tennessee, Arizona, California, and Nebraska.

24. Defendant NEC Electronics America, Inc. ("NEC") is a wholly owned and controlled subsidiary of NEC Electronics Corporation, with its principal place of business at 2880 Scott Boulevard, Santa Clara, California and its manufacturing plant in Roseville, California. During the Class Period, NEC Electronics America, Inc. manufactured, sold and

8

distributed TFT-LCD Products to customers throughout the United States, Tennessee, Arizona, California, and Nebraska.

25. Defendant IDT International Ltd. is an entity organized under the laws of Bermuda, with its principal place of business located at Block C, 9th Floor, Kaiser Estate Phase 1, 41 Man Yue Street, Hunghom, Kowloon, Hong Kong. During the Class Period, IDT International Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

26. Defendant International Display Technology Co., Ltd. is an entity organized under the laws of Japan, with its principal place of business located at Nansei Yaesu Bldg. 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0028, Japan. Defendant International Display Technology Co., Ltd. is a subsidiary of Defendant Chi Mei Optoelectronics Corporation. During the Class Period, International Display Technology Co., Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

27. Defendant International Display Technology USA Inc. is a corporation with its principal place of business located at 101 Metro Drive, Suite 510, San Jose, California. Defendant International Display Technology USA Inc. is a subsidiary of Defendant Chi Mei Optoelectronics Corporation. During the Class Period, International Display Technology USA, Inc. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

28. Defendant AU Optronics is Taiwan's largest manufacturer of TFT-LCD Products and has its corporate headquarters at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Class Period, AU Optronics manufactured, sold and distributed TFT-

9

LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

29. Defendant AU Optronics Corporation America ("AUOCA") is a wholly owned and controlled subsidiary of defendant AU Optronics and has its corporate headquarters at 9720 Cypresswood Drive, Suite 241, Houston, Texas. AUOCA has a facility located in San Diego, California. During the Class Period, AUOCA manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

30. Defendant Chi Mei Optoelectronics Corporation ("Chi Mei") is a leading manufacturer of TFT-LCD Products and has its global headquarters at No. 3, Sec. 1, Huanshi Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan. . During the Class Period, Chi Mei manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

31. Defendant Chi Mei Optoelectronics USA, Inc. is a wholly owned and controlled subsidiary of Chi Mei and has its corporate headquarters at 101 Metro Drive, Suite 510, San Jose, California. During the Class Period, Chi Mei Optoelectronics USA, Inc. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

32. Defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa") is a leading manufacturer of TFT-LCD Products and has its global headquarters at 1127 Hopin Road, Padeh City, Taoyuan, Taiwan. During the Class Period, Chunghwa Picture Tubes, Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

10

33.     Defendant HannStar Display Corporation ("HannStar") is a leading manufacturer of TFT-LCD Products and has its headquarters at No. 480, Reuiguang Road, 12th Floor, Neihu Chiu, Taipei 114, Taiwan.   .   During the Class Period, HannStar Display Corporation manufactured, sold and distributed TFT-LCD Products to customers throughout the United States, including Tennessee, Arizona, California, and Nebraska.

**Co-Conspirators**

34.     Certain other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracies alleged in this complaint.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged.

35.     At all relevant times, each Defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this complaint.  Defendants, and each of them, have participated as members of the conspiracy or acted with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

36.     The acts charged in this complaint have been done by Defendants or were ordered or done by Defendants' officers, agents, employees, or representatives, while actively engaged in the management of defendants' affairs.

## FACTUAL ALLEGATIONS

37.    Defendants and their co-conspirators have engaged in a contract, combination,

trust or conspiracy, the effect of which was to raise the prices at which they sold TFT-LCD

Products to artificially inflated levels from at least January 1, 1998 through at least December 31,

2005.

38.    Very recently, antitrust enforcement authorities in multiple countries have begun

investigating this unlawful cartel.  On December 11, 2006, Defendant LG Philips, in its form 6-K

filed with the SEC, stated the following:

> Last Friday, as part of an investigation of possible anticompetitive conduct
> in the LCD industry, officials from the Korean Fair Trade Commission
> (KFTC) visited the offices of LG Philips LCD in Seoul Korea.  In
> addition, the Japanese Fair Trade Commission (JFTC) issued a notice to
> our offices, in Tokyo, Japan and then the United States Department of
> Justice (DOJ) issued a subpoena to our offices in San Jose, California.

(<http://www.lgphilips-lcd.com/homeContain/jsp/eng/inv/inv200_j_e.jsp>).

39.    On December 11. 2006, the Reuters news agency reported the following:

> Samsung Electronics Co., Ltd. (005930.KS) is being investigated by fair
> trade watchdogs in South Korea, Japan and the United States, the second
> Korean flat screen maker named in a probe into possible price-fixing, a
> news agency report said on Tuesday.
>
> The report, from South Korea's Yonhap news agency, follows a disclosure
> by LG Philips LCD Co., Ltd (034220.KS) on Monday that it was the
> target of an investigation by the Korean Fair Trade Commission (KFTC),
> the Japanese Fair Trade Commission (JFTC) and had received a subpoena
> from the U.S. Department of Justice...
>
> Yonhap citied unnamed regulatory and industry sources in reporting local
> antitrust authorities were  also looking into possible collusion by Samsung
> and LG Philips to fix the prices of LCD products and control their
> supply...
>
> Late on Monday, a KFTC spokesman said the probe was being conducted
> by the Cartel Investigation Group.
> (<http://business.scotsman.com/latest.cfm?id=1843512006>).

40. On December 12 2006, other companies, including AU Optronics, Sharp, and Sanyo Epson, indicated they were under investigation.

41. According to one report, " '[t]he subject of the probe is price fixing,' Akinori Yamada, a director of management and planning at Japan's Fair Trade Commission, said in Tokyo today. He said LG Philips and Samsung were being questioned, although he declined to name or give the number of other companies being investigated. In Washington, U. S. Justice Department spokeswoman Gina Talamona said the agency 'is investigating the possibility of anticompetitive practices' and is cooperating with foreign authorities." (<http://www.bloomberg.com/apps/news?pid=20601080&sid=aSF7WY69eUPg&refer=asia>). Another report indicated that "Min Chun Hong, an analyst at Goodmorning Shihan Securities, said that if the companies [Samsung and LG Philips] were convicted, penalties could amount to about 200 billion won, or $216 million, each." (<http://www.iht.com/articles/2006/12/12/business/ flat.php>).

42. Michael Min, an analyst at Korea Investment and Securities, has been quoted as saying that the investigation may be focused on a period over the last several years when manufacturers of TFT-LCD Products were charging comparable prices. (<http://www.washingtonpost.com/wp-dyn/content/article/2006/12/12/ AR2006121200260.html>).

43. There are also other indications that Defendants have engaged in collusive activity. A "Crystal Cycle" is an industry term that refers to shortages in the supply-and-demand cycle for LCD displays. A recent article in *Infoworld* (available at <http://www.infoworld.com/article/06/06/13/79145_25OPreality_1.html>) cited Chris Connery,

an industry analyst at DisplaySearch, as follows: "[a]ccording to Connery, the talk in the industry is that the manufacturers are looking to create an artificial Crystal Cycle. At a recent conference in Taiwan, a leading producer of LCD glass stated publicaly that the industry should collectively look at a cutting back on production from 100 percent to at least 85 percent. Otherwise, if supply outpaces demand, manufacturers will be forced to cut prices. ... Will the mother-glass manufacturers actually create this artificial shortage? 'The chatter is growing louder each day,' Connery says." A subsequent *Infoworld* article (<http://www.infoworld.com/article/06/06/12/79223_HNphilipscutslcd_1.html>) noted that the unnamed Taiwanese executive came from AU Optronics.

44.     Similarly, Samsung's presentation described above noted that "it was possible to secure a reasonable amount of profit while following the industry leaders" during the Class Period.

45.     Defendants, through their officers, directors and employees, effectuated the aforesaid contract, combination, trust or conspiracy between themselves and their co-conspirators by, among other things:

> a.     participating in meetings and conversations, including through various trade associations and committees, to discuss the prices of TFT-LCD Products in the United States, including Tennessee, Arizona, California, and Nebraska;
>
> b.     agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of TFT-LCD Products sold in the United States, including Tennessee, Arizona, California, and Nebraska;
>
> c.     issuing price announcements and quotations in accordance with the agreements reached; and
>
> d.     selling TFT-LCD Products to various customers in the United States, including Tennessee, Arizona, California, and Nebraska at non-competitive prices.

## FRAUDULENT, ACTIVE, AND SELF-CONCEALMENT

46. Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pretextural and false justifications regarding their price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

47. As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS-ACTION ALLEGATIONS

48. Plaintiff brings this class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Proc7edure on behalf of himself and the following class members:

> **All-Plaintiffs Injunctive-Relief Class (alleged by all Plaintiffs)**
> All persons and business entities in all 50 states that indirectly purchased Thin Film Transistor Liquid Crystal Display and/or products containing Thin Film Transistor Liquid Crystal Display manufactured, sold, or distributed by Defendants, for end use and not for resale, from at least January 1, 1998 through at least December 31, 2005.
>
> Excluded from the Injunctive-Relief Class are Defendants, entities in which Defendants have a controlling interest, Defendants' employees, officers, or directors, Defendants' legal representatives,

successors, or assigns, judicial officers who may hear the case or
related persons, and jurors or related persons.

49.     Plaintiff also brings this class action pursuant to Rule 23(b)(3) of the Federal

Rules of Civil Procedure on behalf of himself and the following class members:

### All-Plaintiffs Money-Damages Class (alleged by all Plaintiffs)

All people and business entities in Tennessee, Arizona, California,
and Nebraska that indirectly purchased Thin Film Transistor
Liquid Crystal Display and/or products containing Thin Film
Transistor Liquid Crystal Display manufactured, sold, or
distributed by Defendants, for end use and not for resale, from at
least January 1, 1998 through at least December 31, 2005.

Excluded from the Money-Damages Class are Defendants, entities
in which Defendants have a controlling interest, Defendants'
employees, officers, or directors, Defendants' legal representatives,
successors, or assigns, judicial officers who may hear the case or
related persons, and jurors or related persons.

50.     Plaintiffs also bring this class action pursuant to Rule 23(b)(3) of the Federal

Rules of Civil Procedure on behalf of themselves and the following respective, individual state

classes:

### Arizona Class (alleged by Plaintiff Friedson)

All people and business entities in Arizona that indirectly purchased Thin Film Transistor
Liquid Crystal Display and/or products containing Thin Film Transistor Liquid Crystal
Display manufactured, sold, or distributed by Defendants, other than for resale, from
November 30, 2002 to present.

### California Class (alleged by Plaintiffs Brooks and Solo)

All people and business entities in California that indirectly purchased Thin Film
Transistor Liquid Crystal Display and/or products containing Thin Film Transistor Liquid
Crystal Display manufactured, sold, or distributed by Defendants, other than for resale,
from November 30, 2002 to present.

### Nebraska Class (alleged by Plaintiff Chung)

All people and business entities in Nebraska that indirectly purchased Thin Film
Transistor Liquid Crystal Display and/or products containing Thin Film Transistor Liquid
Crystal Display manufactured, sold, or distributed by Defendants, other than for resale,
from November 30, 2002 to present.

**Tennessee Class (alleged by Plaintiff Benson)**

All people and business entities in Tennessee that indirectly purchased Thin Film Transistor Liquid Crystal Display and/or products containing Thin Film Transistor Liquid Crystal Display manufactured, sold, or distributed by Defendants, other than for resale, from November 30, 2002 to present.

Excluded from the Arizona, California, Nebraska, and Tennessee classes are Defendants; entities in which Defendants have a controlling interest; Defendants' employees, officers, or directors; Defendants' legal representatives, successors, or assigns; judicial officers who may hear the case or related persons; and jurors or related persons.

51.     Plaintiff has met the requirements of Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

52.     Plaintiffs do not know the exact size of the classes, since this information is in Defendants' exclusive control. But based on the nature of the trade and commerce involved, Plaintiffs believe that each class numbers at least in the hundreds and that the members of each class are geographically dispersed throughout the Class Jurisdictions. Therefore, joinder of the members of each class would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

53.     Plaintiff's claims within the respective classes are typical of other class members' claims because all class members were injured through the uniform misconduct described and paid supra-competitive prices for products containing TFT-LCD Product without being informed that they were paying illegal and improper prices. Accordingly, by proving her own claims, Plaintiff will presumptively prove the respective class members' claims.

54.     The following common questions of law or fact, among others, exist as to the members of the Class:

> a.     Whether Defendants conspired to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively;

b.  Whether Defendants conspired to manipulate and allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively;

c.  The existence and duration of Defendants' horizontal agreements to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively;

d.  The existence and duration of Defendants' horizontal agreements to manipulate and allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively;

e.  Whether each Defendant was a member of, or participated in, the arrangement, contract, or agreement to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively;

f.  Whether each Defendant was a member of, or participated in, the arrangement, contract, or agreement to allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively;

g.  Whether Defendants' conspiracy was implemented;

h.  Whether Defendants took steps to conceal their conspiracy from Plaintiff and the class members;

i.  Whether Defendants' conduct caused injury in fact to the business or property of Plaintiff and the class members, and if so, the appropriate class-wide measure of damages;

j.  Whether the agents, officers or employees of Defendants and their co-conspirators participated in telephone calls, meetings, and other communications in furtherance of their conspiracy; and

k.  Whether the purpose and effect of the acts and omissions alleged was to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively, and to manipulate and allocate the market for TFT-LCD Products marketed, distributed, and sold in the U.S. and/or Tennessee, Arizona, California, and Nebraska, respectively.

55. Plaintiff can and will fairly and adequately represent and protect the respective class members' interests and have no interests that conflict with or are antagonistic to the class members' interests. Plaintiff's attorneys are experienced and competent in complex class action and consumer-antitrust litigation.

56. Class certification of the respective, alternative classes is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because a class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted given that:

      a.     Common questions of law and fact overwhelmingly predominate over any individual questions that may arise among or within the respective, alternative classes and, consequently, enormous economies to the court and parties exist in litigating the common issues on a class-wide basis or, alternatively, bases, instead of on a repetitive individual basis or, alternatively, bases;

      b.     Each individual class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

      c.     Class treatment is required for optimal deterrence and compensation and for limiting the court-awarded reasonable legal expenses incurred by class members; and

      d.     Despite the relatively small size of each individual class member's claim, the aggregate volume of their claims, whether considered in a national class or, alternatively, in Tennessee, Arizona, California, and Nebraska classes, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class or, alternatively, classes.

57. Class certification is appropriate pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecution of separate actions would create a risk of adjudication with respect to individual class members, whether within or among the respective classes, which may,

as a practical matter, dispose of other class members' interests who aren't parties to the adjudication or which may substantially impair or impede their ability to protect their interests. Separate actions prosecuted by individual class members would also create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

58. Class certification, whether as a national class or multiple classes on behalf of class members in Tennessee, Arizona, California, and Nebraska, respectively is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted on grounds generally applicable to the respective class' members.

59. Plaintiff's claims within and among the respective classes are typical of the associated class members' claims because Defendants injured Plaintiff and the respective class members in the same manner (*i.e.,* Plaintiff and the respective class members were forced to pay supra-competitive prices for products containing TFT-LCD Product).

## TRADE AND COMMERCE

60. Throughout the Class Period, Defendants and their co-conspirators engaged in the business of marketing and selling TFT-LCD Products throughout the United States, including in Tennessee, Arizona, California, and Nebraska, respectively.

61. As Defendant LG Philips states on its website, "the thin-film transistor liquid crystal display ("TFT-LCD") is a cutting-edge display, which screens picture information by adjusting the amount of light permitted." (<http://www.lgphilips-lcd.com/homeContain/jsp/eng/tech/tech210_j_e.jsp>). LG Philips further states that "TFT is a circuit formed with semiconductor films on a this glass substrate to control liquid crystals.... This circuit plays a vital role in controlling each pixel, the basic unit of a picture image. The

color filter displays a color image by coating the pixel (red, green and blue) on a glass substrate."

*Id.*

62. At the portion of its website entitled "How TFT-LCD Works", Defendant LG

Philips explains:

> A pixel, the smallest unit to indicate a picture image, is formed by three sub-pixels consisting of red, green and blue. The number of pixels arranged in a display determines the resolution of the TFT-LCD. TFT is composed of a data line (image signal transfer) and gate line (TFT on/off signal transfer). TFT existing in each sub-pixel controls the voltage difference between the TFT glass electrode and the color filter glass electrode in order to adjust the molecular array of liquid crystals. Such a change in the molecule direction of liquid crystals alters the amount of light penetrating the liquid crystal layer. Consequently, the TFT-LCD display shows picture image information.
> (http://www.lgphilips-lcd.com/homeContain/jsp/eng/tech/tech210_01_j_e.jsp>)

63. The company describes some of the applications for TFT-LCD technology as

follows:

> TFT-LCD technology has created a wide range of computer and consumer products that would not have been possible with cathoderay tubes (CRT). The flat and thin attributes of LCDs make them ideal for mobile or portable applications. In addition, LCDs can operate at low voltage levels and dissipate with low heat exposure. Initially, LCDs were incorporated into notebook computers, similar in size and resolution to 12-14 inch CRT monitors. Through innovation, TFT-LCD engineers were able to develop displays providing much higher resolution than CRTs, in addition to producing them in larger sizes.
>
> Today, TFT-LCDs are challenging CRT-based desktop computer monitors. As a result, a wider range of mobile computing applications are now available. Engineers have found ways to reduce weight, thickness, and the frame width of notebook computer displays. New TFT process technologies make it possible to deliver more pixels per inch and allow even portable computers to display more information than the latest CRT monitor. Such technology became available just as DVDs became popular, so consumers can now get DVD players in very thin and light packages. Currently, a similar transformation is occurring with next-generation cell phones and wireless networks.

21

(http://www.lgphilipslcd.com/homeContain/jsp/eng/tech/tech210_02_j_e.j
sp>).

64.    The market for TFT-LCD Products is huge.  An October 10, 2006 article stated

that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year alone, up 70

percent over 2005, with flat-panel sales – most of those using LCD technology – are expected to

reach $US 88 billion this year and $US 100 billion in 2007, according to market research

company Display Search."  (<http://www.theagecom.au/news/home-theatre/they-are-building-it-

but–will-lcd-sales-come/2006/10/09/1160246068541.html#>).

65.    The market for the manufacture and sale of TFT-LCD Products is also conductive

to the type of collusive activity alleged here.  That market is oligopolistic in nature.  According

to date from iSuppli, in 2005, LG Philips had 21.4% of the large TFT-LCD panel global market

share, Samsung had 20.9%, AU Optronics had 14.5%, Chi Mei had 11.8%, and Chunghwa had

7.3%,        while        the        remaining        suppliers        controlled        24.1%.

(<http://www.eetimes.com/showArticle.jhtml?articleID=177101936>).    Samsung took over the

leading        position        in        the        industry        in        2006.

(<http://biz.yahoo.com/rb/061211/lgphilips_investigation.html?.v=2>).

66.    Some of these companies are known antitrust violators.  Samsung, for example,

was fined $300 million by the United States Department of Justice ("DOJ") in October of 2005

for participating in a conspiracy to fix prices for Dynamic Random Access Memory.  It is also

under investigation by the DOJ (along with some of the other Defendants) for fixing prices of

Static Random Access Memory.

67.    The industry is also marked by a web of cross-licensing agreements that facilitate

collusion.  AU Optronics, for example, entered into licensing arrangements with Sharp in 2005

and Samsung in 2006. Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi.

68.     The market for the manufacture and sale of TFT-LCD Products is subject to high manufacturing and technological barriers to entry, some of which are described in Samsung's own November 3, 2005 "Market Perspective & Strategy" presentation available at its website. (<http:www.samsung.com/AboutSAMSUNG/ELECTRONICSGLOBAL/InvestorRelations/IRE ventsPresentations/AnalystDay/index.htm>). Efficient fabrication plants are large and costly. TFT-LCD Products are also subject to technological advances, so that firms within the industry must undertake significant research and development expenses.

69.     The TFT-LCD Products industry has also been subject to significant consolidation during the Class Period, as reflected in AU Optronics' recent acquisition of Quanta Display, the creation in 2001 of AU Optronics itself through the merger of Acer Display and Unipac Optoelectronics, or Fujitsu Limited's transfer of its LCD business to Sharp in 2005.

70.     Defendants sell their TFT-LCD Products through various channels including to manufacturers of electronic products and devices, and to resellers of TFT-LCD products. These electronic products and devices and TFT-LCD Products are then sold, directly or indirectly, to consumers and are not altered during the course of sale.

**CLAIMS**

**COUNT I**
**(Applicable to the Injunctive-Relief Class)**
**VIOLATION OF THE CLAYTON ACT**

71.     Plaintiff repeats and re-alleges paragraphs 1 through 64.

72.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix,

23

maintain, and/or stabilize the prices of TFT-LCD Products in the U.S., including in Tennessee, Arizona, California, and Nebraska, respectively, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

73.     In formulating and carrying out their illegal agreement, understanding, and conspiracy, Defendants and their co-conspirators did the following things, among others:

      a.     Fixed, raised, maintained, and stabilized the prices of TFT-LCD Products;

      b.     Allocated TFT-LCD Products markets among themselves;

      c.     Rigged bids for the award and performance of certain TFT-LCD Products contracts; and

      d.     Allocated among themselves and collusively reduce the production of TFT-LCD Products.

74.     Defendants' combination and conspiracy had the following effects, among others:

      a.     Price competition in the sale of TFT-LCD Products was restrained, suppressed, and/or eliminated in the U.S. including in Tennessee, Arizona, California, and Nebraska, respectively;

      b.     Prices for TFT-LCD Products sold by Defendants and their co-conspirators were fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S. including in Tennessee, Arizona, California, and Nebraska, respectively; and

      c.     Those who purchased TFT-LCD Products directly or indirectly from Defendants and their co-conspirators were deprived of the benefits of free and open competition.

75.     Plaintiff has been injured and will continue to be injured in his business and property by paying more for TFT-LCD Products purchased indirectly from Defendants and their co-conspirators than he would have paid and will pay in the absence of Defendants' conspiracy, including paying more for personal computers and other TFT-LCD Products or products containing TFT-LCD Product components by the manufacturers of those products.

76.     As a proximate cause of Defendants' conspiracy, Plaintiff is entitled to an injunction against Defendants preventing and restraining Defendants' violations.

## COUNT II
### (Applicable to all Plaintiffs and the All-Plaintiffs Money-Damages Class)
### VIOLATION OF TENNESSEE LAW

77.     Plaintiffs repeat and re-allege paragraphs 1 through 70.

78.     Tennessee law permits any person injured indirectly, like the Plaintiffs and class members, to seek redress for their injuries arising out of illegal conspiracies. Specifically, the TTPA provides that:

> Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.[2]

79.     In *Freeman Indus., LLC v. Eastman Chemical Co.*,[3] the Tennessee Supreme Court ruled that the TTPA was triggered not by anti-competitive conduct but by "the effect of the anti-competitive conduct." The Supreme Court also held that the TTPA's applicability, whether invoked by Tennessee residents *or* non-residents, should be judged by "whether the alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree."

80.     During the Class Period, Defendants illegal conduct substantially affected Tennessee commerce and caused injury to consumers in Tennessee.

81.     Due to Defendants' price-fixing and market-allocation activities, TFT-LCD Products' prices increased illegally in Tennessee despite fluctuations in the cost of production.

---

[2] T.C.A. §47-25-106 (2005).
[3] No. E2003-00527-SC-S09-CV, 2005 Tenn. LEXIS 668 (Aug. 25, 2005).

During the Class Period, TFT-LCD Products' prices didn't follow the laws of supply and demand existing in competitive markets, including markets in Tennessee.

82. Defendants' arrangement, contract, or agreement to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, or sold in Tennessee and to manipulate and allocate the market for TFT-LCD Products marketed, distributed, or sold in Tennessee had the following substantial effects on Tennessee commerce:

      a.    The prices of TFT-LCD Products indirectly purchased by Tennesseans were fixed, raised, maintained, and stabilized at inflated, artificial and non-competitive levels;

      b.    Tennesseans lost profits and were deprived of free and open competition in the purchase of TFT-LCD Products;

      c.    Competition in the sale of TFT-LCD Products was restrained in Tennessee; and

      d.    Tennesseans paid higher prices for products containing TFT-LCD Products than they would have paid absent Defendants' conspiracy.

83. During the Class Period, Tennesseans indirectly purchased millions of dollars of Defendants' TFT-LCD Products in Tennessee from Defendants. By reason of Defendants' violations of the TTPA, Plaintiffs and the class members paid significantly more for products containing TFT-LCD Products than they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiffs and the class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

84. Defendants' conspiracy further substantially affected Tennessee commerce because Defendants, either directly or through their agents, engaged in the following activities in or affecting Tennessee:

      a.    Transacted TFT-LCD Products' business in Tennessee;

b.  Contracted to supply or obtain goods or revenue related to their TFT-LCD Products' business in Tennessee;

c.  Intentionally availed themselves of the benefits of doing TFT-LCD Products' business in Tennessee;

d.  Produced, promoted, sold, marketed, and/or distributed TFT-LCD Products in Tennessee, thereby purposefully profiting from access to Tennessee's direct-purchaser and indirect-purchaser TFT-LCD Products' markets;

e.  Caused tortious damage in Tennessee by fixing TFT-LCD Products' prices;

f.  Caused tortious damage in Tennessee by acts or omissions committed outside Tennessee by regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct within Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee;

g.  Committed acts and omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Tennessee while regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct in Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

85.  During the Class Period, Defendants' conspiracy substantially affected Tennessee commerce in the following additional ways:

a.  The Conspiracy's Substantial Effect on Tennesseans' Trade or Commerce: Some price-fixing conspiracies only affect the commerce of a limited geographic region or a limited number of Tennessee residents. Defendants' conspiracy, however, was more far reaching – it substantially affected every person in Tennessee. Because TFT-LCD Products are a component part of many common consumer items, TFT-LCD Products were purchased and consumed by practically every person in Tennessee, in all segments of society, and in all geographic regions. There could hardly be anti-competitive conduct with a more substantial

effect on the commerce of Tennessee and Tennesseans than Defendants' illegal conduct alleged here.

b.   The Substantial Monetary Effect on Tennessee Trade or Commerce: Defendants' TFT-LCD Product conspiracy lasted for years and over that time Defendants sold billions of dollars of TFT-LCD Products in the U.S. With even a modest estimated overcharge during that time, Defendants–who hold virtually all of the TFT-LCD Products market–illegally profited by tens of millions of dollars from their conspiracy. Since TFT-LCD Products are purchased in relationship to a state's total population and Tennessee has 2% of the U.S. population, the conspiracy's adverse effect on Tennessee commerce was at least multiple millions of dollars. Furthermore, the substantial monetary effect on Tennessee is more than to just consumers/indirect purchasers due to lost sales to Tennessee direct purchasers because of Defendants' illegal prices.

c.   Substantially Harmful Effect on the Integrity of the Tennessee Market: The Tennessee market is vulnerable and can be manipulated by conspirators either from outside Tennessee, inside Tennessee, or both. Without enforcing Tennessee's antitrust law to its fullest extent, as expressed by the Tennessee Supreme Court, companies that break the law will remain unpunished, and they will remain able to prey upon Tennesseans without consequence. The Tennessee Supreme Court explained that "the purpose of the TTPA is to protect the state's trade and commerce affected by anticompetitive conduct."[4] Defendants have shattered this very purpose by illegally and criminally victimizing the Tennessee market. Thus, every level of the Tennessee market's integrity has been compromised–from the manufacturer to the middlemen to the consumer.

---

[4] *Id.* at *23.

        d.     The Substantially Adverse Effect on Tennessee Commerce Was Critical to the Criminal Conspiracy's Success: Because TFT-LCD Products are sold throughout the U.S., price arbitrage between states would prevent this conspiracy's effectiveness if it didn't affect every state, including Tennessee. Direct purchasers would buy cheaper TFT-LCD Products in Tennessee and then ship them to unaffected states. Thus, to ensure their conspiracy's effectiveness, Defendants knew that Tennessee commerce had to be, would be, and was substantially affected in order to carry it out.

        e.     Length of Substantial Effect on Tennessee Commerce. Some conspiracies are short-lived. This one lasted for years, during which time Defendants profited from it, thereby permitting them to continue their victimization of Tennessee consumers and have a substantial effect on Tennessee commerce.

86.     During the Class Period, Defendants entered into arrangements, contracts, and agreements to fix prices of and allocate markets for TFT-LCD Products, which arrangements, contracts, and agreements lessened full and free competition in violation of the TTPA.

87.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

        a.     Met to discuss TFT-LCD Products' customers and markets;

        b.     Agreed to charge prices at certain levels and to increase or maintain prices for TFT-LCD Products sold in the U.S., including in Tennessee;

        c.     Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

        d.     Allocated TFT-LCD Products' markets and customers consistent with their illegal agreement.

88.     Defendants' conspiracy had the following substantial effects on Tennessee commerce:

29

a.  TFT-LCD Products' price competition was restrained, suppressed, and eliminated in Tennessee;

b.  TFT-LCD Products' prices were raised, fixed, maintained, and stabilized at artificially high levels in Tennessee;

c.  Plaintiffs and class members who indirectly purchased TFT-LCD Products were deprived of free and open market competition, including in Tennessee, and were injured; and

d.  Plaintiffs and class members paid more than they otherwise would have for TFT-LCD Products that they purchased indirectly, including TFT-LCD Products purchased in Tennessee.

89.  Defendants' price-fixing and market-allocation conspiracy was perpetrated against and substantially affected Tennessee commerce by having victimized Tennesseans and/or by having occurred in Tennessee.  The results of Defendants' actions occurring outside Tennessee also substantially affected Tennessee commerce by increasing the prices Tennesseans paid for products containing Defendants' price-fixed TFT-LCD Products.  As the result of Defendants' illegal actions' substantial effect on Tennessee commerce, both direct and indirect Tennessee purchasers of Defendants' TFT-LCD Products have been injured.

90.  As a direct and proximate result of Defendants' TTPA violations, all Plaintiffs and the All-Plaintiffs class members have suffered injuries and seek damages in an amount necessary to restore them to the position they would have been in had Defendants not violated the TTPA.

**COUNT III**
**(Applicable to Plaintiff Friedson and the Arizona Class)**
**VIOLATION OF ARIZONA LAW**

91.  Plaintiffs incorporate and re-allege paragraphs 1 – 84.

92.  During the Class Period, Defendants engaged in a flagrant contract, combination, or conspiracy in restraint of trade or commerce within Arizona.  In particular, Defendants

conspired to fix TFT-LCD Products' prices and allocate TFT-LCD Products' customers and markets. Defendants' conspiracy lessened full and free competition in TFT-LCD Products' importation and sale into Arizona and controlled their costs, which violated Ariz. Rev. Stat. §44-1401 *et seq.*

93. Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize TFT-LCD Products' prices; (b) allocate TFT-LCD Products' customers and markets; and (c) caused Plaintiff Friedson and the other Arizona class members to pay higher prices for TFT-LCD Products that they indirectly purchased from Defendants.

94. In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

> a. Met to discuss TFT-LCD Products' customers and markets;
>
> b. Agreed to charge prices at certain levels and to increase or maintain prices for TFT-LCD Products sold in Arizona;
>
> c. Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and
>
> d. Allocated TFT-LCD Products' markets and customers consistent with their illegal agreement.

95. Defendants' conspiracy had the following effects:

> a. TFT-LCD Products' price competition was restrained, suppressed, and eliminated throughout the U.S., including in Arizona;
>
> b. TFT-LCD Products' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in Arizona;
>
> c. Plaintiff Friedson and the other Arizona class members that indirectly purchased TFT-LCD Products were deprived of free and open market competition and were injured; and
>
> d. Plaintiff Friedson and the other Arizona class members paid more than they otherwise would have for TFT-LCD Products that they purchased indirectly.

96. Defendants' conspiracy substantially affected trade or commerce within Arizona.

97. During the Class Period, Arizonans indirectly purchased millions of dollars of Defendants' TFT-LCD Products' in Arizona from Defendants. By reason of Defendants' violations of the Arizona Antitrust Act, Plaintiff Friedson and the Arizona class members paid significantly more for products containing TFT-LCD Products than they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Friedson and the Arizona class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

**COUNT IV**
**(Applicable to Plaintiffs Brooks and Solo and the California Class)**
**VIOLATION OF CALIFORNIA LAW**

98. Plaintiffs incorporate and re-allege paragraphs 1 – 91.

99. Beginning at a time unknown to Plaintiffs Brooks and Solo and the other California class members, but at least as early as November 30, 2002 to the present, Defendants engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize TFT-LCD Products' prices and allocate TFT-LCD Products' customers and markets in California. Defendants' conspiracy lessened full and free competition in TFT-LCD Products' importation and sale into California and controlled their costs, in violation of § 16720 *et seq.* of the California Business and Professions Code.

100. Defendants and their co-conspirators communicated at meetings and in conversations to fix, raise, maintain and stabilize the prices of TFT-LCD Products, to allocate markets and customers, reached agreements to charge prices for TFT-LCD Products at certain levels, and otherwise to increase and maintain prices, and issued price announcements and price quotations in California in accordance with their agreements.

32

101.   Defendants' and their co-conspirators' contract, combination, and conspiracy consisted of a continuing agreement, understanding, and concert of action between Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of TFT-LCD Products sold in the U.S., including California, and to allocate markets and customers.

102.   For the purpose of formulating and effectuating the aforesaid contract, combination and conspiracy, Defendants and their co-conspirators did those things which they combined and conspired to do including, but not limited to, the acts, practices, and course of conduct set forth above, and the following, among others:

    a.   Communicated with each other regarding prices to be charged for TFT-LCD Products;

    b.   Agreed to charge prices at certain levels and otherwise to fix, raise, maintain and stabilize prices of TFT-LCD Products sold in the U.S., including California;

    c.   Exchanged information on prices and sales volumes;

    d.   Allocated markets and customers for TFT-LCD Products;

    e.   Agreed on the reduction of production capacity;

    f.    Monitored and implemented the arrangements among cartel members;

    g.   Refrained from competing among themselves with respect to the sale of TFT-LCD Products; and

    h.   Sold TFT-LCD Products at agreed-upon prices.

103.   Defendants' anti-competitive agreement was implemented by a series of coordinated price increase announcements that began in or about 2002. These coordinated price increases continued on a regular basis throughout the Class Period, with the actual and intended

result that Plaintiffs Brooks and Solo and the other California class members paid supra-competitive prices for TFT-LCD Products for years.

104. Similar price increases, in identical amounts and within close temporal proximity, were announced by the Defendants at various times throughout the Class Period.

105. The activities described above were engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful arrangement to fix, raise, maintain, and stabilize the prices of TFT-LCD Products in California.

106. The aforesaid combination and conspiracy had the following effects, among others:

    a.    Price competition in the sale of TFT-LCD Products by Defendants and their co-conspirators was restrained, suppressed and eliminated throughout the U.S., including in California;

    b.    Prices of TFT-LCD Products sold by Defendants and their co-conspirators were raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the U.S., including in California; and

    c.    Purchasers of TFT-LCD Products from Defendants and their co-conspirators, including Plaintiffs Brooks and Solo and the other California class members, were deprived of the benefit of free and open competition.

107. During the Class Period, Plaintiffs Brooks and Solo and the other California class members indirectly purchased substantial quantities of TFT-LCD Products in California from Defendants. By reason of the violations alleged herein, Plaintiffs Brooks and Solo and the other California class members paid more for their purchases of TFT-LCD Products than they would have in the absence of Defendants' illegal contract, combination, and conspiracy. As a result, Plaintiffs Brooks and Solo and the other California class members were injured and suffered damages in an amount presently undetermined.

## COUNT VI
### (Applicable to Plaintiff Chung and the Nebraska Class)

## VIOLATION OF NEBRASKA LAW

108.    Plaintiffs incorporate and re-allege paragraphs 1 - 108.

109.    During the Class Period, Defendants contracted, combined, and conspired in restraint of trade or commerce in Nebraska to fix TFT-LCD Products' prices and allocate TFT-LCD Products' customers and markets. Defendants' conspiracy lessened full and free competition in TFT-LCD Products' importation and sale into Nebraska and controlled their costs, which violated Neb. Rev. Stat. §59-1601 *et seq.*

110.    Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize TFT-LCD Products' prices; (b) allocate TFT-LCD Products' customers and markets; and (c) caused Plaintiff Chung and the other Nebraska class members to pay higher prices for TFT-LCD Products that they indirectly purchased from Defendants.

111.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

        a.    Met to discuss TFT-LCD Products' customers and markets;

        b.    Agreed to charge prices at certain levels and to increase or maintain prices for TFT-LCD Products sold in the U.S., including in Nebraska;

        c.    Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

        d.    Allocated TFT-LCD Products' markets and customers consistent with their illegal agreement.

112.    Defendants' conspiracy had the following effects:

        a.    TFT-LCD Products' price competition was restrained, suppressed, and eliminated throughout the U.S., including in Nebraska;

        b.    TFT-LCD Products' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in Nebraska;

        c.    Plaintiff Chung and the other Nebraska class members that indirectly purchased TFT-LCD Products were deprived of free and open market competition and were injured; and

   d.    Plaintiff Chung and the other Nebraska class members paid more than
         they otherwise would have for TFT-LCD Products that they purchased
         indirectly.

113.    Defendants' conspiracy substantially affected commerce within Nebraska.

114.    During the Class Period, Nebraskans indirectly purchased millions of dollars of
Defendants' TFT-LCD Products in Nebraska from Defendants.  By reason of Defendants'
violations of the Nebraska Antitrust Act, Plaintiff Chung and the Nebraska class members paid
significantly more for products containing TFT-LCD Products than they would have paid in the
absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Chung and
the Nebraska class members were injured in their businesses and property and have suffered
damages in amounts presently undetermined.

**COUNT VII**
**(Applicable to Plaintiff Benson and the Tennessee Class)**
**VIOLATION OF TENNESSEE LAW**

115.    Plaintiffs incorporate and re-allege paragraphs 1 – 115.

116.    During the Class Period, Defendants entered into arrangements, contracts, and
agreements to fix prices of and allocate markets for TFT-LCD Products, which arrangements,
contracts, and agreements lessened full and free competition in violation of the TTPA.

117.    Tennessee law permits any person injured indirectly, like the Plaintiffs and class
members, to seek redress for their injuries arising out of illegal conspiracies.  Specifically, the
TTPA provides that:

> Any person who is injured or damaged by any such arrangement, contract,
> agreement, trust, or combination described in this part may sue for and recover, in
> any court of competent jurisdiction, from any person operating such trust or
> combination the full consideration or sum paid by the person for any goods,

wares, merchandise, or articles, the sale of which is controlled by such combination or trust.[5]

118. In *Freeman Indus., LLC v. Eastman Chemical Co.*,[6] the Tennessee Supreme Court ruled that the TTPA was triggered not by anti-competitive conduct but by "the effect of the anti-competitive conduct." The Supreme Court also held that the TTPA's applicability, whether invoked by Tennessee residents *or* non-residents, should be judged by "whether the alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree."

119. During the Class Period, Defendants illegal conduct substantially affected Tennessee commerce and caused injury to consumers in Tennessee.

120. Due to Defendants' price-fixing and market-allocation activities, TFT-LCD Products' prices increased illegally in Tennessee despite fluctuations in the cost of production.

121. During the Class Period, TFT-LCD Products' prices didn't follow the laws of supply and demand existing in competitive markets, including markets in Tennessee.

122. Defendants' arrangement, contract, or agreement to fix, raise, maintain, or stabilize the prices of TFT-LCD Products marketed, distributed, or sold in Tennessee and to manipulate and allocate the market for TFT-LCD Products marketed, distributed, or sold in Tennessee had the following substantial effects on Tennessee commerce:

        a.    The price of TFT-LCD Products indirectly purchased by Plaintiff Benson and other Tennessee class members was fixed, raised, maintained, and stabilized at inflated, artificial and non-competitive levels;

        b.    Plaintiff Benson and other Tennessee class members lost profits and were deprived of free and open competition in the purchase of TFT-LCD Products;

        c.    Competition in the sale of TFT-LCD Products was restrained in Tennessee; and

---

[5] T.C.A. §47-25-106.

[6] *Supra* note 2.

d.    Plaintiff Benson and other Tennessee class members paid higher prices for products containing TFT-LCD Products than they would have paid absent Defendants' conspiracy.

123.    During the Class Period, Plaintiff Benson and other Tennessee class members indirectly purchased millions of dollars of Defendants' TFT-LCD Products in Tennessee from Defendants. By reason of Defendants' violations of the TTPA, Plaintiff Benson and the other Tennessee class members paid significantly more for products containing TFT-LCD Products that they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Benson and the other Tennessee class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

124.    Defendants' conspiracy further substantially affected Tennessee commerce because Defendants, either directly or through their agents, engaged in the following activities in or affecting Tennessee:

a.    Transacted TFT-LCD Products' business in Tennessee;

b.    Contracted to supply or obtain goods or revenue related to their TFT-LCD Products' business in Tennessee;

c.    Intentionally availed themselves of the benefits of doing TFT-LCD Products' business in Tennessee;

d.    Produced, promoted, sold, marketed, and/or distributed TFT-LCD Products in Tennessee, thereby purposefully profiting from access to Tennessee's direct-purchaser and indirect-purchaser TFT-LCD Products' markets;

e.    Caused tortious damage in Tennessee by fixing TFT-LCD Products' prices;

f.    Caused tortious damage in Tennessee by acts or omissions committed outside Tennessee by regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct within Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee;

g.     Committed acts and omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in Tennessee while regularly doing or soliciting business in Tennessee; engaging in other persistent courses of conduct in Tennessee; and/or deriving substantial revenue from goods used or consumed or services rendered in Tennessee.

125.   In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

a.     Met to discuss TFT-LCD Products' customers and markets;

b.     Agreed to charge prices at certain levels and to increase or maintain prices for TFT-LCD Products sold in Tennessee;

c.     Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

d.     Allocated TFT-LCD Products' markets and customers consistent with their illegal agreement.

126.   Defendants' conspiracy had the following substantial effects on Tennessee commerce:

a.     TFT-LCD Products' price competition was restrained, suppressed, and eliminated in Tennessee;

b.     TFT-LCD Products' prices were raised, fixed, maintained, and stabilized at artificially high levels in Tennessee;

c.     Plaintiffs and class members who indirectly purchased TFT-LCD Products were deprived of free and open market competition, including in Tennessee, and were injured; and

d.     Plaintiffs and class members paid more than they otherwise would have for TFT-LCD Products that they purchased indirectly, including TFT-LCD Products purchased in Tennessee.

127.   During the Class Period, Tennesseans indirectly purchased millions of dollars of Defendants' TFT-LCD Products in Tennessee from Defendants.  By reason of Defendants' violations of the TTPA, Plaintiff Benson and the Tennessee class members paid significantly more for products containing TFT-LCD Products than they would have paid in the absence of Defendants' illegal combination and conspiracy, and, as a result, Plaintiff Benson and the

39

Tennessee class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

## COUNT VIII
### (Applicable to all Plaintiffs and the All-Plaintiffs Class)
### UNJUST ENRICHMENT

128.    Plaintiffs repeat and re-allege paragraphs 1 through 128.

129.    As the result of Defendants' illegal agreement, contract, combination, and conspiracy, Plaintiffs and the class members conferred a benefit upon Defendants, and Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit Defendants to retain this benefit without paying its reasonable value to Plaintiffs and the class members.

130.    As a direct and proximate result of Defendants' unjust enrichment, all Plaintiffs and the All-Plaintiffs Money-Damages class members, or alternatively, all Plaintiffs and the respective, state-law class members suffered injury and seek an order directing Defendants to return to them the amount each of them improperly paid to Defendants, plus interest.

## JURY DEMAND

131.    Plaintiffs demand trial by jury on all triable issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their respective class members' favor and against Defendants, as follows:

A.    That this Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify either or both of the All-Plaintiffs classes or, alternatively, the Tennessee, Arizona, California, and Nebraska classes;

B.    With respect to the All-Plaintiffs Injunctive-Relief class, that this Court rule that Defendants' conspiracy violated the Sherman Act and that injunctive relief under the Clayton Act is appropriate;

C.   With respect to the All-Plaintiffs Money-Damages class, that this Court rule that Defendants' conspiracy violated Tennessee law and that compensatory damages, including treble damages, are appropriate;

D.   Alternatively, with respect to the Arizona class, that this Court rule that Defendants' conspiracy violated Arizona law and that compensatory damages, including treble damages, are appropriate;

E.   Alternatively, with respect to the California class, that this Court rule that Defendants' conspiracy violated California law and that compensatory damages, including treble damages, are appropriate;

F.   Alternatively, with respect to the Nebraska class, that this Court rule that Defendants' conspiracy violated Nebraska law and that compensatory damages, including treble damages, are appropriate;

G.   Alternatively, with respect to the Tennessee class, that this Court rule that Defendants' conspiracy violated Tennessee law and that compensatory damages are appropriate;

H.   With respect to the All-Plaintiffs Class, that this Court determine that Defendants were unjustly enriched;

I.   That this Court permanently enjoin Defendants from conspiring to fix TFT-LCD Products' prices and allocating TFT-LCD Products' markets or other injunctive relief as this Court deems appropriate;

J.   That this Court award Plaintiffs post-judgment interest, their costs, and reasonable attorneys' fees; and

K.   That this Court order any other relief as it deems just and proper.

Respectfully submitted, this 13th day of March, 2007.

Gordon Ball
**BALL & SCOTT**
Suite 601, 550 Main Ave.
Knoxville, TN 37902
Telephone:   (865) 525-7028
Facsimile:   (865) 525-4679
E-mail:       gball@ballandscott.com

Daniel K. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
55 Public Square, Suite 1500
Cleveland, OH 44113-1998
Telephone: (216) 622.1851
Facsimile: (216) 622-1852
E-mail: karon@gsk-law.com

Krishna B. Narine
**LAW OFFICE OF KRISHNA B. NARINE**
7839 Montgomery Ave.
Elkins Park, PA 19027
Telephone: (215) 771-4988
Facsimile: (215) 782-3241
E-mail: knarine@kbnlaw.com

Isaac L. Diel
**SHARP McQUEEN, P.A .**
Financial Plaza
6900 College Boulevard, Suite 285
Overland Park, KS 66211
Telephone: (913) 661-9931
Facsimile: (913) 661-9935
E-mail: dslawkc@aol.com

***Attorneys for Plaintiffs and the Respective, Alternative Classes***